UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 16-cv-60963-BLOOM/Valle

CAROL IACIOFANO,

    Plaintiff,

v.

SCHOOL BOARD OF BROWARD COUNTY, FLORIDA,
and FLORIDA DEPARTMENT OF EDUCATION,

    Defendants.
_____/

## ORDER ON MOTIONS FOR SUMMARY JUDGMENT

**THIS CAUSE** is before the Court upon Motions for Summary Judgment filed by Defendants Florida Department of Education ("FDOE"), ECF No. [45] ("FDOE's Motion"), and School Board of Broward County ("School Board"), ECF No. [54] ("School Board's Motion") (collectively, the "Motions"). The Court has reviewed the Motions, all supporting and opposing filings, the record in this case, and is otherwise fully advised in the premises. For the reasons that follow, the Motions are granted.

**I.    BACKGROUND**

Plaintiff Carol Iaciofano ("Plaintiff") suffers from cerebral palsy. *See* ECF Nos. [45] ¶¶ 1-35 (FDOE's Facts) ¶ 1; [50] (Plaintiff's Facts) (collectively, "Undisputed Facts"). As a result of her disability, Plaintiff often uses a wheelchair and experiences weakness in her lower extremities and balance problems. ECF Nos. [55] (School Board's Facts) ¶ 1; [57] (Plaintiff's Additional Facts) ¶ 1 (collectively, "Additional Facts"). FDOE is an agency of the State of Florida designated for the purpose of effecting compliance with the Rehabilitation Act of 1973 ("Rehabilitation Act") (29 U.S.C. § 701, *et. seq*.), while School Board operates various schools

in Broward County.  *See* Undisputed Facts ¶ 2; Additional Facts ¶ 2.  FDOE's Division of Vocational Rehabilitation (the "Division") is the administrative unit designated under the Rehabilitation Act to provide vocational rehabilitation programs and services to persons who have disabilities, and to this end, receives federal financial assistance.  *See* Undisputed Facts ¶ 4.  Plaintiff has been a client of the Division since 1996, and from 2006 to June 2014, was employed as a substitute teacher with the School Board.  *See id.* ¶ 5; Additional Facts ¶ 5.  Plaintiff applied for new vocational rehabilitation services in 2010, and the Division assigned Sharon Wood ("Wood") to be her counselor.  *See* Undisputed Facts ¶¶ 6, 7.  After undergoing a Preliminary Assessment, Plaintiff and Wood jointly developed, agreed upon, and signed an Individualized Plan for Employment ("IPE") oriented toward achieving an employment outcome of Adult Education Instructor.  *See id.* ¶¶ 9-10.  However, on September 24, 2014, Plaintiff and Wood jointly amended the IPE toward achieving an employment outcome of Court Reporter, approved by the Division supervisor shortly thereafter.  *See id.* ¶¶ 11, 15.  Plaintiff began a court reporting program with funding from the Division at Atlantic Technical College ("ATC") – an entity operated by School Board – on October 27, 2014.  *See id.* ¶ 16.  Pursuant to the September 24, 2014 amendment, Plaintiff was required to attend class regularly and maintain a minimum "C" or 2.0 grade point average, and Wood received monthly progress reports from ATC.  *See id.* ¶¶ 17, 18.  The ATC court reporting program contemplates students attaining a required 225 word per minute skill level within 28 months, though some students take as long as four years to develop the skill.  *See* Additional Facts ¶ 10.  Plaintiff's instructors were Susan Williams ("Williams") and Deborah Berg ("Berg"), and Williams authored many of the evaluation reports Wood received.  *See id.* ¶ 15.

Wood received one such report on July 22, 2015, relaying that Plaintiff "seem[ed] to be progressing at a slower pace as lessons get more difficult." Undisputed Facts ¶ 19. Two weeks later, Wood received a telephone call from Meryl Eisenberg ("Eisenberg"), Disability Services Advisor at ATC, regarding ATC's concerns that Plaintiff was approximately ten lessons behind and that there existed "problems" with her progression. *See id.* ¶¶ 21-22. Specifically, Eisenberg advised Wood that "Plaintiff was having difficulty grasping the material as the course became progressively more difficult, that Plaintiff lacked speed and accuracy, and that Plaintiff had been crying and complaining that her hands were hurting her." *Id.* ¶ 22. Around that time, Plaintiff met separately with Williams and Berg, who expressed their concern that Plaintiff was not a "good fit" for court reporting. Additional Facts ¶ 25. At the meeting, Williams stated that her opinion of Plaintiff had nothing to do with Plaintiff's disability. *See id.* Following the meeting, Eisenberg, Plaintiff, Williams, and Berg participated in a conference call with Wood, relaying the difficulties Plaintiff had been experiencing and explaining that at the current rate, Plaintiff would take much longer than 28 months to complete the court reporting program. *See* Undisputed Facts ¶ 23; Additional Facts ¶ 26. The instructors noted that Plaintiff was behind in her lessons, and that the course was becoming increasingly challenging. Additional Facts ¶¶ 26, 27. They told Wood that Plaintiff is "very smart" and her "mobility limitations were not an issue," and suggested that she consider becoming a paralegal. *Id.* ¶ 27. On August 26, 2015, Wood received another monthly report indicating that Plaintiff was "struggling with accuracy and speed as lessons become more difficult," and that Plaintiff's anticipated grade was a "C." Undisputed Facts ¶¶ 24-25. Nevertheless, Williams and ATC authorized Plaintiff to enroll in classes for the Fall term, and Plaintiff did. *See* Additional Facts ¶ 24. Plaintiff did not, however, attend classes in the Fall or at any time thereafter. *See id.* ¶ 28.

Plaintiff and Wood met to discuss ATC's concerns in early August, and Plaintiff agreed to participate in a worksite evaluation to assess her skills and abilities. *See* Undisputed Facts ¶ 27. In early September, Wood and Plaintiff amended the IPE to include a worksite evaluation, which the Division unit supervisor approved. *See id.* ¶ 29. Plaintiff chose the entity, Stand Among Friends ("SAF"), as the vendor to conduct the worksite evaluation. SAF conducted the evaluation over a two-day period beginning September 29, 2015. *See id.* ¶¶ 30-31; Additional Facts ¶ 30. Following the evaluation, SAF concluded that "[t]o address the original goal of court reporter, becoming a court reporter using a stenotype machine is not recommended." Undisputed Facts ¶ 31. Plaintiff and Wood discussed the worksite evaluation report on October 21, 2015, and re-amended the IPE toward an employment outcome of Adult Basic and Secondary Education and Literacy Teacher and Instructors. *See id.* ¶¶ 32-33. Plaintiff signed the amended IPE, and the Division unit supervisor approved the amendment. *See id.* ¶¶ 33-34. Plaintiff remains a client of the Division and receives vocational funding from FDOE. *See id.* ¶ 35.

Plaintiff brings claims against School Board under Title II of the Americans with Disabilities Act ("ADA") (Count I), and Section 504 of the Rehabilitation Act (Count III). *See* ECF No. [24]. She brings identical causes of action against FDOE at Counts II and IV, respectively. *See id.* FDOE filed its Motion for Summary Judgment on November 17, 2016, and School Board filed its Motion on January 4, 2017. Thereafter, Plaintiff's Responses and Defendants' replies timely followed. *See* ECF Nos. [51], [58], [62], [66].

## II. LEGAL STANDARD

A court may grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law." Fed. R. Civ. P. 56(a). The parties may support their positions by citation to the record, including, *inter alia*, depositions, documents, affidavits, or declarations. *See* Fed. R. Civ. P. 56(c). An issue is genuine if "a reasonable trier of fact could return judgment for the non-moving party." *Miccosukee Tribe of Indians of Fla. v. United States*, 516 F. 3d 1235, 1243 (11th Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986)). A fact is material if it "might affect the outcome of the suit under the governing law." *Id.* (quoting *Anderson*, 477 U.S. at 247-48). The Court views the facts in the light most favorable to the non-moving party and draws all reasonable inferences in the party's favor. *See Davis v. Williams*, 451 F.3d 759, 763 (11th Cir. 2006). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which a jury could reasonably find for the [non-moving party]." *Anderson*, 477 U.S. at 252. The Court does not weigh conflicting evidence. *See Skop v. City of Atlanta, Ga.*, 485 F.3d 1130, 1140 (11th Cir. 2007) (quoting *Carlin Comm'n, Inc. v. S. Bell Tel. & Tel. Co.*, 802 F.2d 1352, 1356 (11th Cir. 1986)).

The moving party shoulders the initial burden to demonstrate the absence of a genuine issue of material fact. *See Shiver v. Chertoff*, 549 F.3d 1342, 1343 (11th Cir. 2008). If a movant satisfies this burden, "the nonmoving party 'must do more than simply show that there is some metaphysical doubt as to the material facts.'" *Ray v. Equifax Info. Servs., L.L.C.*, 327 F. App'x 819, 825 (11th Cir. 2009) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). Instead, "the non-moving party 'must make a sufficient showing on each essential element of the case for which he has the burden of proof.'" *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). The non-moving party must produce evidence, going beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories,

5

and admissions on file, designating specific facts to suggest that a reasonable jury could find in the non-moving party's favor. *Shiver*, 549 F.3d at 1343. But even where an opposing party neglects to submit any alleged material facts in controversy, a court cannot grant summary judgment unless it is satisfied that all of the evidence on the record supports the uncontroverted material facts that the movant has proposed. *See Reese v. Herbert*, 527 F.3d 1253, 1268-69, 1272 (11th Cir. 2008); *United States v. One Piece of Real Prop. Located at 5800 S.W. 74th Ave., Miami, Fla.*, 363 F.3d 1099, 1103 n.6 (11th Cir. 2004).

### III. DISCUSSION

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability . . . be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Similarly, section 504(a) of the Rehabilitation Act mandates that "[n]o otherwise qualified individual with a disability in the United States . . . shall solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). The Eleventh Circuit has made clear that the essential "standard for determining liability under the Rehabilitation Act is the same as that under the [ADA]." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005); *see J.A.M. v. Nova Se. Univ., Inc.*, 2016 WL 1359255, at *4 (11th Cir. Apr. 6, 2016); *T.W. ex rel. Wilson v. Sch. Bd. of Seminole Cnty.*, 610 F.3d 588, 604 (11th Cir. 2010). Accordingly, the Court addresses Plaintiff's claims under a single standard. "In order to establish a *prima facie* case of discrimination under the [Rehabilitation Act] or ADA, the plaintiff must demonstrate that [s]he (1) is disabled, (2) is a qualified individual, and (3) was subjected to unlawful discrimination because of h[er] disability." *J.A.M.*, 646 F. App'x at 926 (citing *Cash v. Smith*, 231 F.3d 1301, 1305 (11th Cir. 2000)). A plaintiff can meet the

third prong by showing that "she was 'denied the benefits of' or 'subject to discrimination' under" a program that receives federal assistance." *Schwarz v. The Villages Charter Sch., Inc.*, 165 F. Supp. 3d 1153, 1202 (M.D. Fla. 2016), *aff'd sub nom.*, 2017 WL 104460 (11th Cir. Jan. 11, 2017) (quoting *Nathanson v. Med. Coll. of Pa.*, 926 F.2d 1368, 1380 (3d Cir. 1991)). As recently explained by one court in this District, discrimination claims can be

> based on either a conventional 'disparate treatment' theory, or a theory that the defendant failed to make 'reasonable accommodations,' or both. Disparate treatment involves discriminatory intent and occurs when a disabled person is singled out for disadvantage because of her disability. By contrast, a failure to make reasonable accommodations claim requires no animus and occurs when a covered entity breaches its affirmative duty to reasonably accommodate the known physical or mental limitations of an otherwise qualified person.

*Forbes v. St. Thomas Univ., Inc.*, 768 F. Supp. 2d 1222, 1227 (S.D. Fla. 2010). To establish a "disparate treatment" theory, "'plaintiffs must prove that they have either been subjected to discrimination or excluded from a program or denied benefits solely by reason of their disability. To prove discrimination in the education context, something more than a mere failure to provide the free appropriate education . . . must be shown.'"[1] *Long v. Murray Cty. Sch. Dist.*, 2012 WL 2277836, at *25 (N.D. Ga. May 21, 2012), *aff'd in part*, 522 F. App'x 576 (11th Cir. 2013)

---

[1] The Court rejects School Board's argument that the Court must evaluate Plaintiff's claims under the Title IX framework set forth in *Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629, 633 (1999) or the Title VII standard for gender-based hostile environment claims. In support of its position, School Board relies heavily on *Long*, *supra*, and the Eleventh Circuit's partial affirmance. However, the district court in *Long* recognized that "courts have applied the case law and reasoning governing Title IX peer-on-peer sexual harassment claims to § 504 and ADA *peer-on-peer* disability harassment claims," and therefore, applied that standard to the peer-on-peer claim presented. *Long*, 2012 WL 2277836, at *25 (collecting out-of-Circuit case law applying the standard to peer-on-peer discrimination claims) (emphasis added); *see Estate of Lance v. Lewisville Indep. Sch. Dist.*, 743 F.3d 982, 995-96 (5th Cir. 2014); *see also Rio v. Runyon*, 972 F. Supp. 1446, 1459 (S.D. Fla. 1997) ("Disability-based *hostile environment claims* are analyzed under the Title VII standards" (emphasis added)); *but see J.S. v. Houston Cty. Bd. of Educ.*, 120 F. Supp. 3d 1287, 1292-93 (M.D. Ala. 2015). Importantly, the Eleventh Circuit only affirmed application of the Title IX standard in *Long* "[b]ecause both parties effectively agree that the deliberate indifference standard set forth in *Davis* . . . should apply to the § 504 and ADA claims." *Long*, 522 F. App'x at 577 n.1; *see Moore v. Chilton Cty. Bd. of Educ.*, 1 F. Supp. 3d 1281, 1292 (M.D. Ala. 2014) (applying standard because parties agreed). The instant case does not involve peer-on-peer discrimination claims or solely hostile environment allegations, and Plaintiff contests application of the Title IX and VII standards.

7

(quoting *S.S. v. Eastern Kentucky Univ.*, 532 F.3d 445, 453 (6th Cir. 2008) (in turn quoting *Sellers v. Sch. Bd. of Manassas*, 141 F.3d 524, 528-29 (4th Cir. 1998))); *see J.A.M.*, 646 F. App'x at 927 ("Here, J.A.M.'s [Rehabilitation Act] claim fails for several reasons. First, J.A.M. did not allege facts demonstrating that Nova dismissed him 'solely by reason of his disability.'" (quoting 29 U.S.C. § 794(a))). "Additionally, '[t]o recover compensatory damages under [section] 504, Plaintiff must demonstrate that the discrimination was intentional.'" *The Villages Charter Sch., Inc.*, 165 F. Supp. 3d at 1202 (quoting *Wendel v. Fla. Dept. of Highway Safety & Motor Vehicles*, 80 F. Supp. 3d 1297, 1302 (M.D. Fla. 2015)); *see Sheely v. MRI Radiology Network, P.A.*, 505 F.3d 1173, 1191 (11th Cir. 2007) (stating that "victims of intentional discrimination may recover compensatory damages" while "victims of unintentional discrimination may be limited to prospective relief preventing future violations").

Defendants do not challenge Plaintiff's claim that she is disabled or a "qualified individual," but argue that the record lacks evidence to show that Plaintiff suffered discrimination because of her cerebral palsy disability. Plaintiff, in turn, makes clear that she "has not made a wholly separate claim for failure to accommodate," ECF No. [58] at 9, and Plaintiff has not cited evidence that supports a separate "failure to accommodate" cause of action. *See Coal. for the Abolition of Marijuana Prohibition v. City of Atlanta*, 219 F.3d 1301, 1326 (11th Cir. 2000) ("The appellants' failure to brief and argue this issue during the proceedings before the district court is grounds for finding that the issue has been abandoned."). Accordingly, in order to survive summary judgment, Plaintiff must present evidence of a "discriminatory intent" or "animus" such that a reasonable jury could determine that she was "singled out for disadvantage because of her disability." *Forbes*, 768 F. Supp. 2d at 1227. Plaintiff, however, has not presented any direct evidence of discrimination. *See Long v.*

*Alabama Dep't of Human Res.*, 650 F. App'x 957, 968 (11th Cir. 2016) ("Direct evidence is 'evidence, which if believed, proves' [discrimination] 'without inference or presumption.'") (quoting *Merritt v. Dillard Paper Co.*, 120 F.3d 1181, 1189 (11th Cir. 1997) ("Evidence that only suggests discrimination or that is subject to more than one interpretation does not constitute direct evidence." (internal citations omitted))).  Accordingly, the burden-shifting framework described in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) applies.  *See Webb v. Donley*, 347 F. App'x 443, 445 (11th Cir. 2009) ("In the absence of direct evidence of discrimination, the burden-shifting analysis applies to claims under the Rehabilitation Act."); *Wascura v. City of S. Miami*, 257 F.3d 1238, 1242 (11th Cir. 2001) (holding the burden-shifting analysis applies to claims under the ADA).

> Under this framework, the plaintiff must establish a *prima facie* case of discrimination. The establishment of a *prima facie* case creates a presumption of discrimination. The [defendant] must then offer legitimate, nondiscriminatory reasons for the [ ] action to rebut the presumption. If the [defendant] successfully rebuts the presumption, the burden shifts back to the plaintiff to discredit the proffered nondiscriminatory reasons by showing that they are pretextual.

*Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1331 (11th Cir. 1998).

At the onset, the Court notes that Plaintiff's case is not one "'permeated with discriminatory intimidation, ridicule, and insult . . . sufficiently severe or pervasive to alter the conditions of [her schooling] environment.'" *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002) (quoting *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993)) (alterations added).  Rather, Plaintiff points to various incidences that she argues, in the aggregate, demonstrate that she was singled out for disadvantage during her time at ATC because of her cerebral palsy.[2]  The Court disagrees.[3]

---

[2] The Court rejects Plaintiff's apparent argument in Response that she also suffered discrimination "because of [her] perceived disability relating to her hands," ECF No. [51] at 6, as Plaintiff did not plead this as a basis for discrimination in her Amended Complaint.  *See* ECF No. [24] ¶ 6 ("Iaciofano is an

Plaintiff claims that she was discriminated against while attending a court reporting course at ATC, and additionally, through Wood's subsequent "adopt[ion]" of the opinion that Plaintiff was not a "good fit" for court reporting. ECF No. [51] at 6. Nowhere does Plaintiff allege that Wood or anyone else employed by the FDOE or School Board harbored a discriminatory animus toward Plaintiff. The Court, therefore, begins with the evidence of record pertaining to Plaintiff's time at ATC. Essentially, Plaintiff claims that Williams, Berg, and Eisenberg "rushed" her through the court reporter program, "set[ ] her up to fail," and then baselessly recommended that she switch career trajectories, evidencing their discriminatory intent. It is undisputed, however, that the ATC court reporting program contemplates students attain a required 225 word per minute skill level within 28 months (though some students take longer), and that by at least July 2015, Plaintiff "lacked speed and accuracy" and "seem[ed] to be progressing at a slower pace as lessons g[o]t more difficult." Additional Facts ¶ 10; Undisputed Facts ¶¶ 19, 22, 24-25; ECF No. [55-12] (ATC evaluations) at 8-9. It is also undisputed that by August 2015, Plaintiff was at least three or four lessons behind,[4] and her instructors advised that she would take significantly longer than 28 months to complete the program. Undisputed Facts ¶ 23. Plaintiff herself concedes that she experienced increased difficulty as the course became more challenging. *See, e.g.*, Plaintiff's Depo. at 76:17-18; 78:22-25–79:1-9. She received a

---

individual with Cerebral Palsy which affects the use of her legs. Plaintiff is bound to a wheelchair. As a result, she is a qualified individual with a disability under the definitions of both the ADA and the Rehabilitation Act."); *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004) ("A plaintiff may not amend her complaint through argument in a brief opposing summary judgment.").

[3] Because the Court finds that Plaintiff has not produced evidence sufficient to survive summary judgment, the Court does not address FDOE's preliminary argument, relying on *Baumeister v. New Mexico Comm'n for the Blind*, 425 F. Supp. 2d 1250 (D.N.M. 2006), that Plaintiff fatally failed to exhaust the administrative remedies provided by the Rehabilitation Act.

[4] Plaintiff concedes that her instructors believed her ten lessons behind, and that her instructors relayed this information to Wood. *See* Undisputed Facts ¶ 22. In her deposition, however, Plaintiff states that she was only three or four lessons behind. ECF No. [50-2] ("Plaintiff's Depo.") at 98:8. In her affidavit, she states she fell five or six lessons behind. *See* ECF No. [50-6] ("Plaintiff's Aff.") ¶ 17.

grade of "C" for the term ending in June 2015, and received another "C" at the end of July. *See id.* at 87:3; Additional Facts ¶¶ 23-24. Plaintiff neither alleges nor identifies evidence to support a finding that her grades or Williams's progress reports were meritless or pretextual.

Despite Plaintiff's performance in June and July, Williams and Berg granted their approval for Plaintiff to attend ATC during the Fall Semester, a fact that significantly undermines Plaintiff's claim that Defendant School Board denied her "meaningful access" to the court reporting program. *See* Plaintiff's Depo. at 93:19-20 ("Q So you had registered for the fall term? A Yes."), 116:21-24 ("A I was allowed to go down there and enroll."); *Alexander v. Choate*, 469 U.S. 287, 301 (1985); *see also Ass'n for Disabled Americans v. City of Orlando*, 153 F. Supp. 2d 1310, 1321 (M.D. Fla. 2001) ("reluctance to patronize the facilities in the future is unfortunate; however, the Court must not confuse a conscious decision not to attend events at the facilities with a denial of access to those events."). So too, the record does not support Plaintiff's contention that ATC staff singled out and "rushed" her through the program because of her disability. In fact, although Plaintiff never requested that her instructors slow down the program to accommodate her disability, Plaintiff testified that on the one occasion she mentioned she felt "rushed," Williams actually slowed down the pace, resulting in Plaintiff then asserting that the pace was too *slow*. *See* Plaintiff's Depo. at 82:18-20, 83:2-4. In any event, Plaintiff has not produced evidence to support a finding that the speed of her course was the result of a discriminatory motive. Rather, Plaintiff testified that Williams was motivated, at least in part, "to get me through the program" and at the skill level of one of her classmates. *Id.* at 77:6-8. Plaintiff testified that Williams treated the *entire* class in a similar – if arguably stern – manner, and that at least two of Plaintiff's non-disabled classmates dropped the course entirely. *See id.* at 85, 86:3-4 (Williams told the class that "she was not our mother. She didn't want to hear us

complaining."); *see also* ECF No. [46-2] at 20-27 (SAF Assessment) at 2 (documenting that Plaintiff informed SAF "that other students questioned if [Williams] liked teaching and related that she seemed to pick favorites, and to use information against you."). Williams, however, never singled out Plaintiff for a disadvantage during class; in the only reference to Plaintiff's disability, Williams *complimented* Plaintiff on her punctuality and used her as an example for the class to follow. *See id.* at 102:1-5. Even viewed in the light most favorable to Plaintiff, the evidence of record fails to show that Williams or anyone else at ATC "rushed" Plaintiff through the court reporting course with a discriminatory intent or because of her disability.

Plaintiff's other experiences at ATC similarly fail to evince a discriminatory animus on the part of Williams, Berg, or Eisenberg. As an initial matter, Plaintiff's reliance on ATC's allegedly deficient accommodations as a basis for her *disparate treatment* cause of action is somewhat problematic, as "[a] failure to provide reasonable accommodations is a distinct, actionable theory of discrimination under the ADA and the Rehabilitation Act" that requires "a plaintiff [first] actually request an accommodation and be refused." *Redding v. Nova Se. Univ., Inc.*, 165 F. Supp. 3d 1274, 1294 (S.D. Fla. 2016); *Schwarz v. City of Treasure Island*, 544 F.3d 1201, 1219 (11th Cir. 2008); *see Gaston v. Bellingrath Gardens & Home, Inc.*, 167 F.3d 1361, 1363 (11th Cir. 1999) ("the duty to provide a reasonable accommodation is not triggered unless a specific demand for an accommodation has been made"). Plaintiff never requested many of the allegedly lacking "accommodations" she now relies upon as evidence of her instructors' discriminatory animus. *See* Plaintiff's Depo. at 36:9-14 ("Q Did that email make any reference to this issue with regard to Gabriel being allowed to take her machine home? A I didn't bring any other student into my - my business. I just inquired where - when the machine was coming."), 48:25–49-2 ("Q Did you ask her to do anything about [having to change rooms]? A I didn't ask

12

her to do anything about it, no."),[5] 59:5-11 (Q Did you ever have any other conversations with Ms. [Grigull] where you voiced some sort of complaint about Ms. Williams? A No. Q Did you ever voice a complaint at all about Ms. Berg? A Never."),[6] 148:20–149:1 ("Q Did you ever request an accommodation that would allow you to stay in one class? A I did not. Q Did you ever request an accommodation to maybe receive instruction on the first floor? A That wasn't an option. It's a computer lab we have. It had to be attached to computers."); *see also* ECF No. [55-14] (notes of Ms. Grigull). As to the requests Plaintiff actually made, the record shows that ATC and its instructors accommodated them to a large extent. For example, in addition to slowing down the pace of the class when Plaintiff mentioned feeling rushed, Williams allowed Plaintiff to use a school stenotype machine while she awaited her custom-built device. *See* Plaintiff's Depo. at 32:33-25. When Plaintiff mentioned that the handrail in the school's bathroom was too high, ATC corrected the issue "immediately." *Id.* at 48:3-11, 157:2-8. When Plaintiff requested "that my breaks be a little longer so I can have time in the bathroom if needed," ATC "accommodated that request." *Id.* at 157:2-8. Regarding the school's elevator, when it broke down in January of 2015, Berg contacted Plaintiff and suggested that she work from home, and responded to Plaintiff's emails. *See id.* at 51:1-15. When Plaintiff returned to school the next day and "complained that the elevator wasn't working still . . . [s]omebody came out to fix it that afternoon." *Id.* at 51:17-19. When the elevator broke in March, Berg again called Plaintiff to notify her of the issue, and allowed her to work from home. *See id.* at 54:17–

---

[5] The record also shows that all students – not simply Plaintiff – had to regularly change rooms between the two instructors. *See* ECF No. [57-2] at 78 (Williams Deposition); Additional Facts ¶ 15.

[6] Regarding Plaintiff's statement that Williams did not provide her with a dictionary, Plaintiff concedes that ATC did not provide Williams with "a dictionary to give to anybody," that other students secured their dictionaries through fellow students, and that Plaintiff eventually similarly obtained a dictionary. Plaintiff's Depo. at 61:14-16, 63:1-14.

55-2. Even putting ATC's accommodations aside, the sporadic mechanical failures identified by Plaintiff fail to establish a basis for liability under the ADA. *See Gomez v. Dade Cty. Fed. Credit Union*, 610 F. App'x 859, 861 (11th Cir. 2015) ("the regulations do not prohibit isolated or temporary interruptions in service or access due to maintenance or repairs" (internal quotations and alterations omitted)).

Having determined that the record does not establish a *prima facie* case of discrimination based on (a) Williams's or Berg's conduct during the court reporting course, or (b) ATC's accommodations, the Court proceeds to the events of May to August 2015. After receiving back-to-back "Cs" and falling at least three or four lessons behind, Plaintiff met with Williams, Berg, and Eisenberg in late July. At the meeting, Williams told Plaintiff that court reporting "wasn't for everyone but that [Plaintiff was] a very bright person," and suggested that she pursue a different career. Plaintiff's Depo. at 95:11-16; *see* ECF No. [57-10] (Eisenberg's notes). Plaintiff had previously believed Williams to be a "dream teacher,"[7] but during a separate meeting with Williams and Berg, Williams repeatedly made clear that her suggestion and comment "wasn't about [Plaintiff's] disability." Plaintiff's Depo. at 82:2-4, 101:18-19. That, according to Plaintiff, was the moment Williams's and ATC's discriminatory intent manifested: "it wasn't – till then that it became apparent it was about my disability." *Id.* at 101:19-20. The Court cannot agree, even drawing all reasonable inferences in Plaintiff's favor.

Williams expressly stated that her opinion had nothing to do with Plaintiff's disability, and the evidence of record unequivocally shows that Plaintiff had indeed begun to fall behind in class and receive unfavorable grades as the course progressed. Eisenberg comprehensively

---

[7] Apparently the feeling was mutual from October 2014 until May 2015, wherein Williams consistently rated Plaintiff as an "excellent" or "good" student, and described her as a "pleasure to have in class." *See* ECF No. [55-12]. That Williams rated Plaintiff favorably and complimented her abilities for seven months further indicates that her subsequent actions and evaluations lacked a discriminatory animus.

documented ATC's concerns in her meeting notes found at ECF No. [57-10], and nothing contained therein or anywhere else in the record evidences a discriminatory animus linked to Plaintiff's cerebral palsy. Judges must "show 'great respect' for a faculty's professional judgment when reviewing a genuinely academic decision and 'may not override it unless it is such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment.'" *Redding*, 165 F. Supp. 3d at 1291 (quoting *Regents of the University of Michigan v. Ewing*, 474 U.S. 214, 225 (1985))[8]; *see Rance v. Florida Dep't of Educ.*, 2011 WL 1099262, at *8 (S.D. Fla. Mar. 22, 2011). The record is devoid of evidence to suggest that Williams's evaluations or the grades Plaintiff received constituted "a substantial departure from accepted academic norms"; in fact, Williams and ATC *approved* Plaintiff to attend classes in the Fall. *See* Additional Facts ¶ 24; Plaintiff's Depo. at 107:5-7, 116:23-24. To summarize Plaintiff's own testimony on the issue, she did not believe herself the victim of discrimination during the ten months predating Williams's statement, and even after that statement, lacked a concrete basis for her belief. *See* Plaintiff's Depo. at 122:8-11 (Williams "made it about my disability. Q How did she do that? A I don't know how she did it, but she did."), 160:2-5 ("Q What makes you think that Ms. Williams harbored any animus to your disability or towards your condition? A She stopped working with me."), 161:25–162:1 ("I think she was saying that to cover herself."). Even combined with the other circumstantial facts of record, Plaintiff's suspicion that Williams harbored a discriminatory bias based on her *contrary* statement does not constitute evidence upon which a jury could

---

[8] While "[t]he Eleventh Circuit does not appear to have explicitly decided *Ewing*'s applicability to disability discrimination cases," the First Circuit has, and its decision is "consistent with current Eleventh Circuit law." *Redding*, 165 F. Supp. 3d at 1291-92 (citing *Wynne v. Tufts Univ. Sch. of Med.*, 932 F.2d 19, 25-6 (1st Cir. 1991) and *Wood v. President & Trustees of Spring Hill Coll. in City of Mobile*, 978 F.2d 1214, 1222-23 (11th Cir. 1992) (holding, in disability discrimination context, that academic institutions are entitled to deference in their determination of qualifications for their programs)).

reasonably find a *prima facie* case of discrimination established. *See Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996) ("For factual issues to be considered genuine, they must have a real basis in the record." (quoting *Hairston v. Gainesville Sun Publ'g Co*., 9 F.3d 913, 919 (11th Cir. 1993)); *Bald Mountain Park, Ltd. v. Oliver*, 863 F.2d 1560, 1564 (11th Cir. 1989) ("In passing upon a motion for summary judgment, a finding of fact which may be inferred but not demanded by circumstantial evidence has no probative value against positive and uncontradicted evidence that no such fact exists." (internal quotations omitted)); *see also Ellis*, 432 F.3d at 1327 ("Ellis offered no evidence, other than his own conclusory statements, and failed to identify what those positions were, where this occurred, or how he knew this. . . . mere conclusions and unsupported factual allegations . . . are insufficient to withstand a motion for summary judgment."); *Hall v. Thomas*, 753 F. Supp. 2d 1113, 1161 (N.D. Ala. 2010) (on summary judgment, "Plaintiff Hall's unsupported belief that the company provided housing to unauthorized immigrants, premised purely on hearsay and speculation, cannot indicate defendants engaged in activity constituting 'harboring.'").

As the record lacks an evidentiary basis to support a finding that Williams or other employees at ATC discriminated against Plaintiff, the Court turns to Plaintiff's claims against FDOE (via Wood) specifically. Again, Plaintiff does not claim that Wood actually harbored a discriminatory bias against her due to her cerebral palsy. Moreover, the uncontested record shows that Wood made funding decisions in this case based on the evaluations and grades sent by ATC, the conversations she had with her supervisor, Williams, Berg, Eisenberg, and Plaintiff, and the SAF evaluation. Plaintiff also does not allege, much less provide evidence to support a finding, that Wood decided to employ a worksite evaluation based on a discriminatory animus toward Plaintiff and her disability. Rather, the record indisputably shows that Wood decided

16

upon an evaluation after speaking with the ATC instructors, receiving negative progress reports and declining grades, speaking with Plaintiff and obtaining her acquiescence, and securing the approval of the Division supervisor. *See* ECF No. [46-2] ("Wood Aff.") ¶¶ 17-23. While Plaintiff claims that Wood pressured her to undergo the work evaluation, she also testified that Wood "never refused" to provide funding lest Plaintiff undergo the evaluation, and Plaintiff herself chose SAF as the independent vendor. Plaintiff's Depo. at 109:11-12 ("we were going to wait for the evaluation."); *see id.* at 111:12-19 ("Q So Ms. Wood told you I'm not going to give you this voucher? A She never said that. Q Did you say that? A Never said that. The voucher was on her desk. Q You never asked her for it? A I never asked for it."), 111:25–112:1; Undisputed Facts ¶ 30. Importantly, Plaintiff testified that the decision to discontinue the court reporting track was based largely on the findings made by SAF after a two-day evaluation, undercutting any argument that Wood made her decisions on an underdeveloped record. *See* Plaintiff's Depo. at 105:23-25 ("She said not to worry about it; that we need to set up with an agency, a work evaluation, vend out and to wait and see what the work evaluation said."), 150:15-19 ("If the work evaluation came back and said court reporting was a good fit, then that would be it. It did not. The work evaluation said that it was a best fit that I didn't return for court reporting."); *see also* Wood Aff. ¶ 29; SAF Assessment at 12 (documenting findings and concluding that "court reporter using a stenotype machine is not recommended."). Accepting, for the moment, Plaintiff's position that Wood made future funding contingent on a positive worksite evaluation, the record is still devoid of evidence to indicate that Wood made her decisions with discriminatory intent, or that Wood's actions otherwise denied Plaintiff "meaningful access" to the court reporting program within the meaning of binding precedent. *See Alexander*, 469 U.S. at 302 ("The 14-day limitation will not deny respondents meaningful

access to Tennessee Medicaid services or exclude them from those services. The new limitation does not invoke criteria that have a particular exclusionary effect on the handicapped; the reduction, *neutral on its face*, does not distinguish between those whose coverage will be reduced and those whose coverage will not on the basis of any test, judgment, or trait *that the handicapped as a class* are less capable of meeting or less likely of having." (emphasis added)).

The facts surrounding whether Wood made future funding dependent on a positive worksite evaluation or whether Plaintiff fully agreed to abandon court reporting are in dispute. But the disputes are not material. Even if, as Plaintiff claims, Wood failed to conduct sufficient "due diligence," ECF No. [51] at 4, the information Wood unquestionably relied upon lacked a discriminatory foundation. It is not the role of this Court to ensure that a worksite evaluation is "properly administered," nor is it the Court's duty to review the reasonableness of ATC's, SAF's, or Wood's conclusions. *See Wood v. President & Trs. of Spring Hill Coll. in City of Mobile*, 978 F.2d 1214, 1219 (11th Cir. 1992) ("good faith attempts to pursue legitimate ends are not sufficient to support an award of compensatory damages under section 504."); *see also Houston Cty. Bd. of Educ.*, 120 F. Supp. 3d at 1295 ("A school does not violate § 504 by merely . . . providing an incorrect evaluation, by providing a substantially faulty individualized education plan, or merely because the court would have evaluated a child differently." (internal quotations omitted)). Rather, this Court has the limited role of determining whether Plaintiff produced sufficient evidence to establish that Wood, SAF, ATC, or its employees excluded Plaintiff from the court reporting program or singled her out for disadvantage *because of* her disability. *See Murray v. Browner*, 1996 WL 383304, at *7 (D.D.C. June 27, 1996) ("The Court's role is not to decide whether the agency was right or wrong when it made its selection decision, but whether that decision was made on a discriminatory basis."). Plaintiff remains a

client of the Division and FDOE and continues to receive funding to obtain a vocation, *see* Plaintiff's Depo. at 152:13-25, and "[w]hile the purpose behind the Rehabilitation Act is to create 'meaningful' employment and opportunities for disabled individuals, that goal is not the same as creating 'optimal' or 'premium' employment." *Rance*, 2011 WL 1099262, at *8; *see Berg v. Florida Dept. of Labor and Employment Sec., Div. of Voc. Rehabilitation*, 163 F.3d 1251, 1256 (11th Cir. 1998) ("there is nothing in the Rehabilitation Act that mandates the public, through the defendant, must finance the pursuit . . . of premium employment."). Because Plaintiff has not produced evidence sufficient to establish, *prima facially*,[9] that she was excluded from the court reporting program or treated differently because of her disability, Defendants are entitled to summary judgment.

## IV.  CONCLUSION

For the reasons stated herein, it is **ORDERED AND ADJUDGED** that the Motions, **ECF Nos. [45] and [54],** are **GRANTED.** To the extent not otherwise disposed of, all pending motions are **DENIED** as moot. Final Judgment will be entered by separate order.

**DONE AND ORDERED** in Miami, Florida this 10th day of January, 2017.

_____
**BETH BLOOM
UNITED STATES DISTRICT JUDGE**

Copies to:

Counsel of Record

---

[9] Even if the Court were to assume, *arguendo*, that Plaintiff has established a *prima facie* case of discrimination, Defendants would still prevail, as the Court finds that Defendants have articulated non-discriminatory reasons for the actions taken and Plaintiff has failed to present evidence to establish that Defendants' stated reasons were pretextual. *See Lewellyn v. Sarasota Cty. Sch. Bd.*, 2009 WL 5214983, at *10-*11 (M.D. Fla. Dec. 29, 2009), *aff'd sub nom.*, 442 F. App'x 446 (11th Cir. 2011); *see Standard*, 161 F.3d at 1331.